# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK DIVISION

| | |
|---|---|
| ELIZABETH BROWN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA, and HYUNDAI MOTOR COMPANY, LTD,<br><br>Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Elizabeth Brown ("Plaintiff" or "Ms. Brown") brings this action against Defendant Hyundai Motor America ("HMA") and Hyundai Motor Company ("HMC"), (collectively, "Defendants"), by and through her attorneys, individually and behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.    This consumer class action arises from a latent defect found in model year ("MY") 2011 through 2016 Hyundai Elantra cars with "Nu" 1.8-liter engines (the "Class Vehicles").

2.     First unveiled with MY 2011 Hyundai Elantras, defects in the piston assemblies of the Nu 1.8L engines within the Class Vehicles cause total and irreparable engine failures, the symptoms of which include a knocking noise from the engine while the car is warming up after being started and/or while driving (the "Piston Defect"). Once the fateful engine knock sound begins, the Class Vehicle's engine will inevitably fail completely, causing a loss of engine power, power steering and brake assistance which can lead to stalling while the Class Vehicle is in motion and place the operator of the Class Vehicle, and those that share the road with them, at risk of accident, injury, or death. Once the Piston Defect has manifested, the engine block has been damaged beyond repair. Therefore, the only fix is replacement of the engine, which can cost upwards of $10,000.

3.     Defendants' knowledge of the Piston Defect dates back to no later than 2011, when it began to make changes to its piston manufacturing processes.  Hyundai made additional changes related to the Piston Defect in 2013. And in March 2014, Hyundai Auto Canada Corp., a subsidiary of Hyundai Motor Corporation, issued a Technical Service Bulletin arising from engine knock in Elantras. Covering model year 2011 through 2013 Hyundai Elantras, the bulletin attributed engine knock to manufacturing defects in the pistons and connecting rods of Nu 1.8L engines. Canadian Hyundai dealers were instructed to replace Nu 1.8L engines affected by engine knock. No such relief was offered in the United States, though the Class Vehicles' engines were

built on the same assembly lines, using the same defective parts and manufacturing practices.

4.    Consumers who report engine knock in the Class Vehicles routinely have their concerns dismissed by Hyundai dealers, who describe the sound as "normal." When a knocking engine inevitably fails due to the Piston Defect, Hyundai routinely denies knowledge of the engine knock issue and denies warranty claims, instead blaming the consumer for inadequate maintenance. Even where a replacement engine is provided under the warranty, the replacement is just as likely to fail as the original engine due to it containing the same latent defect.

5.    Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or their agents to request that they remedy and/or address the defect and/or resultant damage at no expense. Defendants have routinely failed to do so, even within the warranty period.

6.    Defendants have also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period. Because the defect can manifest shortly outside of the warranty period for the Class Vehicles— and given Defendants' knowledge of this concealed, safety-related defect—Defendants' attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

7.      Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale durability testing, Defendants have not recalled and/or offered an adequate engine repair to the Class Vehicles, offered their customers suitable repairs or replacements free of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the defect.

8.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

9.      Had Plaintiff and other Class Members known of the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

10.     Plaintiff is also informed and believes, and on that basis alleges, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

11.     As a result of the defect and the monetary costs associated with attempting to repair the defect, Plaintiff and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

12.     This case seeks protection and relief for owners and lessees of Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties and Defendants' unfair, unlawful, and deceptive trade practices.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district.  Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

15.    This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## THE PARTIES

**A.    Plaintiff Liz Brown**

16.    Plaintiff Liz Brown is a citizen of the State of New Jersey and resides in Avenel, New Jersey.

17.    In August 2013, Plaintiff Liz Brown purchased a new 2013 Hyundai Elantra Limited, containing a "Nu" 1.8 liter engine, from Avenel Sansone Auto Group ("Sansone"), an authorized Hyundai dealer and repair center located in Avenel, New Jersey.

18.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Her vehicle bears Vehicle Identification Number: KMHDH4AE6DU715726.

19.    In deciding to purchase an Elantra, Plaintiff Brown relied on Hyundai's representations about the various features of her vehicle, none of which disclosed the Piston Defect described herein.

20.    In late October 2017, Plaintiff Brown began to notice a ticking noise emanating from her Elantra's engine at startup. Approximately one week later, the engine

of Plaintiff Brown's Elantra catastrophically failed with about 64,000 miles on the odometer. At the time, her son was driving and heard a loud popping sound before the engine failed.

21.   Plaintiff Brown had her car towed to Sansone Auto Group for inspection and repairs during the week of November 6, 2017. At Sansone, she was informed that her warranty claim and that a loaner vehicle would take a day or two to authorize.  Several days later she was informed that oil sludge was found in her engine and that Hyundai would be denying her warranty claim due to inadequate maintenance.

22.   Hyundai corporate told Plaintiff Brown to file a complaint to the Better Business Bureau and that they would honor the BBB's decision. When she submitted a claim to BBB, she was informed that they would not consider her claim because her vehicle had more than 60,000 miles on the odometer.

23.   Though the engine of Plaintiff Brown's Elantra was still covered by Hyundai's 10-year/100,000 mile powertrain warranty, Hyundai blamed the engine failure on her alleged inadequate maintenance and denied warranty coverage. Specifically, Hyundai informed Plaintiff Brown that her engine was full of oil sludge, which was caused by her failure to timely change the oil in her vehicle. Sansome informed her that the least expensive option to repair her vehicle would be to install a used engine, which would cost approximately $3,500.

24.     Since approximately November 2017, Plaintiff Brown has been without a usable mode of transportation. She has been forced to ask for rides to and from work and/or borrow her children's vehicles.

25.     Plaintiff Brown's Elantra now sits in her driveway. She continues to pay approximately $470 per month for her auto loan as well as approximately $3,000 per year for auto insurance.

26.     Plaintiff Brown has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Piston Defect, including, but not limited to, out of pocket loss associated with the Piston Defect and future attempted repairs and diminished value of his vehicle.

27.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Piston Defect and/or defective vehicle design prior to purchase.

**B.    The Defendants**

28.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

29.     Defendant Hyundai Motor Company, Ltd. ("HMC") is a South Korean corporation.  HMC is the parent corporation of Hyundai Motor America, Inc.  HMC,

through its various entities, designs, manufactures, markets, distributes and sells Hyundai automobiles in California and multiple other locations in the United States

30.     Defendant Hyundai Motor America, Inc. ("HMA") is incorporated and headquartered in the State of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.  HMA is HMC's U.S. sales and marketing division, which oversees sales and other operations across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealers.  Money received from the purchase of a Hyundai vehicle from a dealership flows from the dealer to HMA.

31.     HMA and HMC sell Hyundai vehicles through a network of dealerships that are the agents of HMA and HMC.

32.     There exists, and at all times herein existed, a unity of ownership between HMC, HMA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

33.     Upon information and belief, Defendant HMC communicates with Defendant HMA concerning virtually all aspects of the Hyundai products it distributes within the United States.

34.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Nu Engine as it relates to the

engine defect within the Class Vehicles were performed exclusively by Defendants HMA and HMC.

35.    Upon information and belief, Defendants HMA and HMC developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

36.    HMA and HMC are collectively referred to in this complaint as "Hyundai" or "Defendants" unless identified separately.

37.    Hyundai engages in continuous and substantial business in New Jersey.

38.    Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## TOLLING OF STATUTES OF LIMITATION

39.    Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discovered the true, latent defective

nature of the Piston Defect until shortly before this class action litigation was commenced.

40.    Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the Class the true character, quality and nature of the Class Vehicles and that it will require costly repairs, and diminishes the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## COMMON FACTUAL ALLEGATIONS

### A.    Background on Hyundai

41.    Hyundai Motor America, headquartered in Fountain Valley, California, is a subsidiary of Hyundai Motor Corporation, a South Korean corporation. Hyundai Motor Corporation, a multinational corporation with nearly 80,000 employees, is the fourth-largest automobile manufacturer in the world.

42.    More than 50% of Hyundai vehicles sold worldwide are sold in the United States, where Hyundai Motor America manages domestic sales, marketing and distribution of Hyundai vehicles and employs approximately 32,000 people at Hyundai dealerships throughout the United States.

43.    Hyundai maintains testing facilities and equipment in California City, California, where it conducts pre-sale durability testing, among other things.

**B.     The Class Vehicles' Nu 1.8-liter multiport injection engines**

44.     First released in MY 2011 Hyundai Elantras, the Nu 1.8L MPI engines are four-cylinder gasoline engines developed by Hyundai in conjunction with Kia.

45.     Hyundai manufactured the Class Vehicles' Nu 1.8L engines in at least two locations including the Hyundai Motor Manufacturing Alabama facility in Montgomery, Alabama and in Hyundai's manufacturing facility in Ulsan, South Korea.

46.     On information and belief, the engines in the Class Vehicles were built with the same parts, on the same assembly lines, and using the same manufacturing processes, as Elantra cars sold in Canada by Hyundai Auto Canada Corporation.

**C.     The Piston Defect in the Class Vehicles' Nu 1.8L engines**

47.     The Piston Defect affects critical components in the Class Vehicle's engines, a brief overview of which is provided below.

48.     Like most gasoline-powered internal combustion engines, the Nu 1.8L MPI engine powers a vehicle's wheels by igniting fuel inside combustion chambers.

49.     The combustion cycle begins when oxygen and fuel enter the combustion chamber through the opening of an intake valve ("I" in the diagram below).



50.    The pressure created by combustion moves the piston ("P") down. The piston is attached to the connecting rod ("R"), which converts the vertical movement of the piston into the rotational force that turns the crankshaft ("C") powering the wheels. Each of the engine's pistons are connected to the crankshaft in a reciprocal arrangement, such that the downward movement of one piston leads to the upward movement of another piston.

51.    During operation, the piston and connecting rods are in constant rapid motion. A failure of any of these components can cause the engine to catastrophically fail.

**D.    Hyundai Canada's 2014 Technical Service Bulletin about the Piston Defect**

52.    On March 3, 2014, Hyundai Auto Canada Corp. ("HACC") issued Technical Service Bulletin ("Bulletin") 14-20-002, attached hereto as Exhibit A.

53.    Covering all MY 2011—2013 Hyundai Elantra cars in Canada with Nu 1.8L engines, the TSB addressed engines exhibiting a knocking noise. After "extensive quality

research with Hyundai Motor Manufacturing Alabama (HMMA) to determine the root cause," HACC attributed the engine knocking to "defects in the piston skirt coating as well as improper finishing of the connecting rods."

54.    According to HACC's TSB, these defects were more likely to manifest in the presence of cold temperatures, poor fuel quality, or fuel delivery issues. HACC described the symptoms of the defects as "the engine exhibits a loud knock during start up but the noise reduces as the engine reaches operating temperature."

55.    HACC instructed dealers to replace engines exhibiting the knocking noise without any further diagnosis or teardown of the engine. HACC also instructed dealers to reject warranty claims if a perfect oil change record could not be produced by the owner or lessee.

56.    HACC also provided a timeline of various attempts to resolve the defects:

    i.      September 2011 - added piston surface alkali washing;

    ii.     June 2013 – improved quality control of connecting rod manufacturing process; and

    iii.    September 2013 – improved piston surface finish.

57.    Though the vehicles subject to HACC's Bulletin were built on the same assembly line with the same parts as the Class Vehicles, Hyundai has not issued a technical service bulletin for American vehicles.

**E.    The impact of the Piston Defect on the Class Vehicles**

14

58.    The knocking sound described in HACC's Bulletin is consistent with a

phenomenon called "piston slap," which occurs when there is an excessive gap between

the piston and the cylinder enclosing it. Under such circumstances, the piston head is not

secured in the cylinder, allowing the piston to rotate and causing the piston's edges to

collide with the cylinder wall. The knocking noise created by piston slap typically fades

once the engine reaches operating temperature and the piston expands to sit securely in

the cylinder.



59.    On information and belief, piston slap in the Class Vehicles irreparably

damages the pistons, coatings applied to the piston and cylinder walls, the cylinder walls,

and stresses the entire piston assembly. The impact caused by piston slap removes metal

and coatings from the cylinder and piston, and some of this dislodged material is then

pulled into the crankcase, where it enters the engine's oil supply.

60.    In addition, the material that is removed from the piston or cylinder by

piston slap leaves small grooves or divots in the cylinder or piston. Unburned fuel,

contaminants, and combustion byproducts such as soot, oil an unburned fuel escape the combustion chamber through these grooves or divots and enter the engine's oil supply in the crankcase.

61.    Over time, the accumulation of contaminants in the oil supply from piston slap creates an oil sludge that clogs oil ports in the engine. Clogged oil ports lead to metal-on-metal contact between moving components that are ordinarily separated by a layer of oil in the engine. This metal-on-metal contact creates metal shavings that also enter the oil supply, worsening the oil clogs. Metal shavings in the oil supply can also get lodged between moving parts, causing the engine to seize.

**F.    Hyundai's knowledge of the Piston Defect**

62.    Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration (NHTSA), (4) warranty and post-warranty claims, (5) internal pre-sale durability testing and TSBs, and (5) other various sources, were well aware of the Piston Defect but failed to notify customers of the nature and extent of the problems with Class Vehicle engines or to provide any adequate remedy.

63.    HACC's 2014 Bulletin states that it conducted its investigation of the Piston Defect in conjunction with Hyundai Motor Manufacturing Alabama, beginning no later than 2011 and continuing through at least 2013.

64.    A mechanical failure involving the piston assembly can cause total engine failure, leading to a loss of engine power and power steering. Hyundai acknowledged that unexpected engine failures "at higher speeds can increase the risk of a crash." NHTSA Recall No. 17V-226 (Mar. 31, 2017).

65.    Consumer complaints to NHTSA suggest that Hyundai recognizes the safety risk posed: "Engine ticking. Brought it in and they informed me I need an engine replacement. They also informed me if I do not get the engine fixed and continue to drive it, it could stall and or potentially blow up." NHTSA Id. No. 10984687.

66.    Other reports suggest that Hyundai is well aware of a widespread issue, as detailed in this post concerning a 2015 Elantra with a Nu 1.8L engine. "As I sat down with the service advisor to resume what would be done on my Elantra, I casually brought up the subject that my engine was knocking. He grabbed my keys, followed me outside and started my car. The knocking was apparent as soon as the engine turned over. The advisor told me that I would need a new short block. Just like that. He continued to say that this problem is well known throughout Hyundai. He did not go into details as to what the problem actually is, only that the short block is on back-order for 6 weeks and to drive the car like I normally do until then." http://www.hyundai-forums.com/md-2011-2016-elantra-sedan-coupe/612233-canadians-engine-block-replacement-advice-6.html#post5611122 (Last visited Apr. 2, 2018).

67.    The following sampling of complaints to NHTSA concerning 2013 Elantras demonstrates the manifestation of the defect, the safety risk the defect and engine failures pose, and engine failures occurring throughout the warranty period.

| **Complaint Date:** Mar. 22, 2018 | **NHTSA ID Number:** 11080987 |
|---|---|

**Summary:**
Car had been making an awful sound, ticking almost for a while... Took it to the garage and it was diagnosed as the engine completely shot. They said there were 12 other Elantras at their garage alone waiting to be repaired for the exact same issue. They said certain years they've noticed are being affected, but it doesn't matter the mileage, they're getting cars with even just 20k miles coming in need of a new engine. Estimated the part at $2400, don't have that to spare.

| **Complaint Date:** Mar. 13, 2018 | **NHTSA ID Number:** 11078960 |
|---|---|

**Summary:**
Tl* the contact owns a 2013 Hyundai Elantra. While driving at an undisclosed speed, there was an abnormal knocking sound in the engine. The vehicle was taken to Wilkins Hyundai . . . where it was diagnosed that the engine needed to be replaced. The vehicle was not repaired due to the engines being on backorder. The manufacturer was not notified of the failure. The approximate failure mileage was 64,999. The vin was not available.

| **Complaint Date:** Mar. 6, 2018 | **NHTSA ID Number:** 11076482 |
|---|---|

**Summary:**
2/23/2018 at highway speed near 70 mph, in spring valley, ca. Making sweeping right turn, engine suddenly stops, coast to road shoulder, engine fails start attempts, tow truck called. At tow impound yard 3 days of engine attempt failed. End of 3rd day impound, tow manager started car, ran okay, but car was towed to dealer to assure engine okay. The dealer found no fault with the vehicle. A consumer reporter publication, had 18 same year same model Hyundais with high speed right turn engine failures, but no fix of the problem by dealer or private mechanics for the 18 Hyundai owners. It appears Hyundai is hiding this right turn fault from nhsa, and the public. 18 had repeat incidents after the initial failure.

| **Complaint Date:** Feb. 28, 2018 | **NHTSA ID Number:** 11075514 |
|---|---|

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. While driving various speeds with the accelerator pedal depressed, there was an abnormal noise from the front of the vehicle. The failure recurred several times. The vehicle was taken to patriot GMC Hyundai (2001 se Washington Blvd, Bartlesville, OK 74006) where it was diagnosed that the engine needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure and did not assist. The vin was not available. The approximate failure mileage was 87,200.

| **Complaint Date:** Feb. 1, 2018 | **NHTSA ID Number:** 11066498 |
|---|---|

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. The contact noticed a knocking noise coming from the engine. There were no warning indicators illuminated. The vehicle was taken to Prestige Hyundai . . . where it was diagnosed that the lower bearing in the engine needed to be replaced. The vehicle was not repaired. The manufacturer was not notified of the failure. The approximate failure mileage was 121,000.

| **Complaint Date:** Jan. 22, 2018 | **NHTSA ID Number:** 11064067 |
|---|---|

**Summary:**

The engine seized while driving on the highway and the car stalled out.

| **Complaint Date:** Dec. 14, 2017 | **NHTSA ID Number:** 11054826 |
|---|---|

**Summary:**

I took my car to the shop today because it had this horrible ticking sound in the engine. I found out a need a new engine

| **Complaint Date:** July 19, 2017 | **NHTSA ID Number:** 11006387 |
|---|---|

**Summary:**

Car stutters, rpms drop, and car stalls when it comes to a complete stop at stop sign or traffic light. This happens when driving without warning in all conditions-- hot/cold, morning/evening, etc. Following this, car will be difficult to restart and slow to accelerate; then rpms raise to 5 and car goes into gear. This has been happening since april 2017 and has been to the dealer 3 times. (4th time tomorrow)

| **Complaint Date:** July 18, 2017 | **NHTSA ID Number:** 11006253 |
|---|---|

**Summary:**

Pin came out from bottom of engine

| **Complaint Date:** June 7, 2017 | **NHTSA ID Number:** 10993695 |
|---|---|

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. While exiting the highway and decelerating from approximately 60-35 mph, the vehicle suddenly decelerated to 15 mph on its own. The vehicle was towed to Shaffer Hyundai where it was diagnosed that the throttle bar failed and the engine needed to be replaced. The vehicle was repaired. The contact stated that the vehicle was emitting an odor of burning oil. While driving approximately 55 mph, the vehicle suddenly stalled and the oil and battery indicators illuminated. The contact had the vehicle towed to the Webb Hyundai dealer where it was diagnosed that the engine needed to be replaced. The contact was informed that the vehicle would be repaired shortly. The manufacturer was not made aware of the failures. The vin was unknown. The approximate failure mileage was 67,000.

**Complaint Date:** May 18, 2017          **NHTSA ID Number:** 10986405

**Summary:**

My 2013 Elantra (appx. 54k miles) began making noises when turning while driving and when stalling. Twice the vehicle lost acceleration and shut off while driving on local streets. I took the vehicle to the dealer service department in February 2017 and they indicated there was no oil in the car and the engine needed to be replaced. It had been less than 5k miles since the last oil change. The repairs and rental are both covered under warranty. After replacing the engine and a few other parts, I was told my vehicle was ready for pickup in March 2017. I got in the car and noticed a noise. The advisor and tech said its because of a new pump and will go away after driving a few miles. Immediately after driving off and entering the highway I heard a dragging noise and the engine light came on. I turned around and went back to the service department. They kept the vehicle and placed me in another rental. It is now may 2017 and the car is still in the service department. The engine has been replace twice and other parts have been replace multiple times as well. I was told by the service manager that Hyundai has sent out an engineer to look at the vehicle. At this point it appears they do not know the problem and/or cannot fix the problem. I am no longer confident in the safety of my car and Hyundai vehicles over all.

**Complaint Date:** May 09, 2017          **NHTSA ID Number:** 10984539

**Summary:**

I bought a 2013 Hyundai Elantra limited new. 3 years later the car stalls out when stopped and it difficult to start. Have taken the car to the dealership so many times (10) within a 2 month period, I use the loaner more than my own car. The last time I picked it up they had changed out the timing cover with oil pump, cam shaft and timing chain. Called me to come pick my vehicle up as it was ready. When exiting the dealership, I came to the stop light and the car stalled once again with it being difficult to start. Turned around and the vehicle would not drive faster than 20 mph. The service

20

manager came out and asked what was wrong. I asked him to get in the vehicle that they had just fixed. He drove it and they now have my car once again and I'm driving the loaner. They can't seem to find out what the problem is and say they keep calling the manufacturer for input. Apparently no one knows what is wrong and I will not buy another Hyundai as it seems they can't repair their vehicles with these similar problems.

**Complaint Date:** Jan. 28, 2017              **NHTSA ID Number:** 10948158

**Summary:**
At 60k miles, a knocking sound came from the engine after rough idling. The engine oil now has metal shavings. Dealership denied that there have ever been problems. Never missed an oil change. Trying to get dealer to cover under warranty.

**Complaint Date:** Jan. 23, 2017              **NHTSA ID Number:** 10947067

**Summary:**
Tl* the contact owns a 2013 Hyundai Elantra. While driving 55 mph, the contact observed an abnormal sound from the engine and the check engine indicator illuminated. The dealer diagnosed that the engine assembly needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was 84,000.

**Complaint Date:** Jan. 19, 2017              **NHTSA ID Number:** 10946559

**Summary:**
After 50k miles the car started to idle rough. Changed spark plugs, air filter, etc. Still ran rough. Car now stalls out when stopped in traffic, and lately will not accelerate up to speed from a stopped position too well. Started to hear a 'clicking' noise that is synced when I press the gas. The vehicle is now stalling when I put it in reverse as well.

**Complaint Date:** Oct. 18, 2016              **NHTSA ID Number:** 10917176

**Summary:**
Engine failure. Zero compression cylinder #1. Second time this has happened since purchase on 10/18/2016. . . . Bought vehicle, cash, from enterprise car sales in montclair, ca. It was a "Certified" used car, supposedly. Immediately I noticed that the engine sounded "Tinny". Sounded like a sewing machine, it was knocking. Also, when I lifted the oil stick, smoke came out of engine. This was within 2 weeks after purchase. The car completely lost compression on interstate 10 in april, 2015. I told both Hyundai and enterprise who ignored my complaints. Finally, after several complaints and threats, enterprise took the car in and sent it to Hyundai dealership who claimed there was no problem. The car began losing power again in september, 2016 and finally stopped in the middle of the street in arcadia, ca. No compression. It had to be towed to

my house. I took it to private shop who said "Zero compression in cylinder #1, possible burned out valve '. See attached. Called hyindai and enterprise again. Both denied responsibility, and refused to do anything. I have to now pay over $1,000 to get engine rebuilt. This car is a lemon and I am enttied to refund or a new car.

**Complaint Date:** Aug. 29, 2016            **NHTSA ID Number:** 10899374

**Summary:**

Auto stalled while driving on a clear day, light traffic, 25 mph, no warning lights, engine was running smooth, engine stalled and could not be re-started, road way was level with no turn involved. Auto had to be towed.

**Complaint Date:** Aug. 4, 2016            **NHTSA ID Number:** 108933301

**Summary:**

On numerous occasions, my car would stall out during left turns (middle of intersections) and while accelerating on an entrance ramp. There were no warning lights prior to stalling. I took it in for service/ diagnostics. I was told it is possible for the Elantra to suck up to 1qt of oil per 1000 miles! Due to the mechanics of the car, it could stall out while turning if low on oil. I was due for my regular oil change and it was completed during this service at which time they stated I was 2 qts low !! It was suggested that I come in every 2000 miles to have it checked. My concern is -without warning lights, do I have to stall in the middle of an intersection to let me know my oil is low ????

**Complaint Date:** Dec. 3, 2015            **NHTSA ID Number:** 10808282

**Summary:**

My 2013 Elantra's engine recently stalled and now needs to be replaced, and the underlying problem as explained to me by the Hyundai service dept. Sounds extremely similar to the problems that led to the recent sonata recall. Here's what happened: I was sitting at a stoplight when I heard a strange clicking/knocking noise from the engine. The vehicle began to have a very rough idle, shaking noticeably. The engine then stalled. After about 30 seconds of trying, I was able to start the engine again but still experienced a very rough idle and the check engine light had turned on. I took it to the Hyundai dealership. After the service department had looked at my car, they told me the engine needed to be replaced and that they were going to file a warranty claim. I was told that the engine bearings had failed, and that when they don't work properly to reduce friction in the engine, metal shards can get into the engine and cause problems. As I understand it from reading about the recent class-action against Hyundai, this sounds virtually identical to the problems with the sonata engines that ultimately led to the recall. I am still waiting to hear about the warranty (I'm still under the full 5 year/60k miles cpo warranty), but wanted to report this issue since what I've been told

is so similar to the issues with the sonata engines. If the warranty claim is denied, I plan to request documentation of the problems with the vehicle and will be happy to provide them to nhtsa.

**Complaint Date:** May 4, 2015              **NHTSA ID Number:** 10714372

**Summary:**
My 2013 Elantra started making a tapping noise so I took it to the service department. It seems my 3 year old vehicle needs a new engine. That was almost three weeks ago and I am still waiting. Neither my dealer nor Hyundai can give me and eta as to when the car will be repaired. Unacceptable and from what I gather from the service manager and the posts on this site, I am not alone. My respect for Hyundai has cratered and will never buy another Hyundai.

**Complaint Date:** Mar. 7, 2015              **NHTSA ID Number:** 10692742

**Summary:**
I bought a used 2013 Hyundai Elantra with 29,802 miles on it on October 6, 2014. By february 2015 I started hearing a tapping noise from under the hood and a noise when I pressed the gas pedal which stopped when I took my foot off the gas pedal. I took it to a Hyundai dealership in February 2015 and it was determined I needed my engine replaced. Hyundai agreed to replace it under factory warranty. I had 32,500 I believe miles on it. The dealership had multiple cars sitting on their lot which needed their engines replaced. While I was waiting for a rental car business to come pick me up at the Hyundai dealership to get me a rental car to drive while my car was waiting to be fixed, I spoke to a couple who came in to drop off their rental car. Their 2012 Hyundai Elantra needed an engine replacement as well--at 23,000 miles. The dealership told me that these cars had engine problems more often in the northeast due to the more severe weather in the winter. I so regret ever buying my first ever Hyundai vehicle!

**Complaint Date:** Apr. 29, 2014              **NHTSA ID Number:** 10585564

**Summary:**
While driving my vehicle at highway speed, the vehicle suddenly stalled without any apparent reason. I was in the middle lane of a three-lane highway. I had to coast over to the side of the highway with no steering or brakes due to the engine failure. Once at the side of the highway, the vehicle re-started immediately and ran normally again for about a week when the same thing happened again, this time on a side street at approximately 15 mph. The vehicle once again started back up with no problem. It has run normally again as of this posting.

**Complaint Date:** July 13, 2013              **NHTSA ID Number:** 10524640

**Summary:**
Vehicle was stopped at a traffic light and started idling roughly and engine shut off. Doral had a Hyundai motor "Field engineer" ([xxx]) look at it on july 11 and I was informed through the service adviser that this was typical of these models and that she, personally, had chosen to ignore it; she works for a Hyundai dealership. Furthermore, nothing can be done. Please refer to previous complaint. Thank you. Information redacted pursuant to the freedom of information act (foia), 5 u.S.C. 552(b)(6).

**Complaint Date:** May 31, 2012          **NHTSA ID Number:**  10460159
**Summary:**
When driving the vehicle on the high way I 29 n at about 68-72 mph the brand new vehicle engine stalled abruptly and the steering wheel froze and we were stuck in the direction the steering was previously turned it and it made impossible for us to steer it on to the shoulder and the vehicle behind us almost crashed into us. We were just a whisker away from getting killed. We had a near death experience and my fiance is still having nightmares about it. *tr

### G.    Hyundai's performance under its written warranties

68.    Hyundai issued two relevant warranties covering each Class Vehicle and each Class Vehicle's powertrain.

69.    Under the New Vehicle Limited Warranty, Hyundai promised to repair defects reported within the earlier of 5 years or 60,000 miles.

70.    Under the Powertrain Warranty, Hyundai promised to repair defects affecting various powertrain components through 10 years and 100,000 miles, including, in relevant part, the following engine components: cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger. The powertrain warranty also covered components in the Class Vehicle's transaxle and transmission.

71.    Hyundai routinely evades its warranty obligations in response to complaints about the Piston Defect by failing to tell consumers that their vehicles are defective and by representing that: (1) the engine knock symptom of the Piston Defect is normal and does not merit diagnosis or repairs; and (2) the cause of engine failures from the Piston Defect is the owner's neglect to properly maintain the engine oil and/or engine oil level or their use of aftermarket filters.

72.    Hyundai also routinely denies warranty repairs for Class Vehicle owners or lessees who reported Piston Defect symptoms during the warranty period but had their Nu 1.8L engines fail from the piston defect outside of the warranty period.

73.    In addition, Defendant has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including requiring that all oil changes be completed at a Hyundai dealership, before determining whether to make the necessary repairs under warranty. Hyundai is well aware that the Piston Defect in the Class Vehicles' engines manifests even if the owner or lessee has followed the Defendants' oil change guidelines.

74.    Hyundai is further aware that the Piston Defect creates oil sludge in the engine.  Upon the detection of oil sludge in an engine affected by the Piston Defect, Hyundai routinely blames the oil sludge—and engine failure—on inadequate maintenance by the consumer.  Even proof of adequate maintenance is no guarantee that Hyundai will take responsibility for an engine impacted by the Piston Defect.

75.     In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Piston Defect (despite such defect having been contained in the Class Vehicles when manufactured by Defendants), repair and replacement of the Nu 1.8L engine, and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components. A replacement engine in a Class Vehicle can cost upwards of $10,000 including installation costs.

76.     Despite its extensive knowledge of the Piston Defect, Hyundai has continued to conceal the Defect. Because consumers would find the Piston Defect material to their purchase decisions. This deceptive practice has occurred in spite of the materiality of the Piston Defect to consumers' purchase decisions and in spite of the safety risks posed by the Piston Defect and the duties imposed on the Defendant to inform vehicle owners and prospective purchasers of the Piston Defect. Defendant knowingly and intentionally concealed material information about the Defect with the intent that Plaintiff and the Class members would purchase the Class Vehicles.

## CLASS ALLEGATIONS

77.     Plaintiff brings this action on behalf of themselves, and on behalf of the following nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the nationwide class consists of the following:

**Nationwide Class:**
All persons or entities in United States who are current or former owners and/or

lessees of a Class Vehicle (the "Nationwide Class").

81.    In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiff seeks to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above:

**New Jersey Subclass:**
All persons or entities in New Jersey who are current or former owners and/or lessees of a Class Vehicle (the "New Jersey Class").

78.    The Class and the New Jersey Subclass (collectively, the "Class") exclude the following: Defendants, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case. Also excluded are any current or former owners or lessees of Class Vehicles with personal injury claims related to the Piston Defect. Plaintiff reserves the right to modify, change, or expand the definitions of the Class and Subclass based upon discovery and further investigation.

79.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. At least hundreds of thousands of Class members have been subjected to Defendants' conduct. The class is ascertainable by reference to records in the possession of HMA and HMC.

80.    *Predominance*: Common questions of law and fact exist as to all members of the Class and Subclass. These questions predominate over questions affecting individual members of the Class and Subclass and include:

        a.    Whether the Class Vehicles were sold with a Piston Defect;

b.  Whether Defendants knew of the Piston Defect at the time of sale;

c.  Whether Defendants failed to disclose the Piston Defect;

d.  Whether Defendants actively concealed the Piston Defect;

e.  Whether a reasonable consumer would consider the Piston Defect or its manifestation to be material;

f.  Whether Defendants breached express and/or implied warranties;

g.  Whether Defendants must disclose the Piston Defect; and

h.  Whether Defendants violated consumer protection statutes and the other claims asserted herein.

81.  *Typicality*: Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting, and selling the Class Vehicles. All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all Class members were injured in the same manner by Defendants' uniform course of conduct described herein. Plaintiff and all Class members have the same claims against Defendants relating to the conduct alleged herein, and the same events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all Class members.  Plaintiff and all Class members sustained economic injuries including, but not limited to, ascertainable losses arising out of Defendants' course of conduct as described herein. Plaintiff is advancing

the same claims and legal theories on behalf of herself and all absent Class and/or Subclass members.

82.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

83.    *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

84.    *Manageability*: Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

85.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class and New Jersey State Subclass)

86.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

87.    Plaintiff Brown brings this claim on behalf of herself and on behalf of the Class.

88.    Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

89.    The engine parts affected by the Piston Defect were distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided to all purchasers and lessors of Class Vehicles.

90.    Defendants breached these warranties by selling and leasing Class Vehicles with the Defect, requiring repair or replacement within the applicable warranty periods,

30

and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

91.     Plaintiff notified Defendants of the breach within a reasonable time though they were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also knew of the Defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

92.     As a direct and proximate cause of Defendants' breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the Piston Defect.

93.     Defendants' attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

94.     Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

95.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity

in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and that their engines would fail well before their useful lives.

96.    Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

<u>COUNT II</u>
**BREACH OF IMPLIED WARRANTY**
**(On Behalf of the Nationwide Class and New Jersey Subclass)**

97.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

98.    Plaintiff brings this claim on behalf of herself and on behalf of the Class.

99.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

100.    Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, the Class Vehicles and their engines suffered from the Piston Defect, which causes the Class Vehicles to experience premature and

catastrophic engine failure. Therefore, the Class Vehicles are not merchantable and are not fit for their particular purpose of providing safe and reliable transportation.

101.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

102.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

103.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## COUNT III
## BREACH OF WRITTEN WARRANTY UNDER THE
## MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, et seq.)
## (On Behalf of the Nationwide Class and the New Jersey Subclass)

104.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

105.    Plaintiff brings this claim on behalf of themselves and on behalf of the Class.

106.    Plaintiff and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

107.    Each Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

108.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

109.    Defendants' warranties for the Class Vehicles are "written warranties" within the meaning of 15 U.S.C. §2301(6).

110.    Defendants breached their express warranties by:

> i.  Providing a 10 year/100,000 mile Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;
>
> ii. Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

    iii.  Refusing or failing to honor its express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the Defect.

111.  Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

112.  Defendants' breach of the express warranties has deprived Plaintiff and the other Class Members of the benefit of their bargain.

113.  The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

114.  Defendants have been afforded reasonable opportunities to cure its breaches of the written warranties and/or Plaintiff and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received from Plaintiff, Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

115.  As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and the other Class Members sustained damages and other losses in

an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other

Class Members, who are entitled to recover actual damages, consequential damages,

specific performance, diminution in value, costs, including statutory fees and/or other

relief as deemed appropriate.

**COUNT IV**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. §§ 56:8-1, et seq.)**
**(On Behalf of the New Jersey Subclass)**

116.   Plaintiff incorporates by reference each preceding paragraph as though fully

set

117.   Plaintiff Brown brings this action on behalf of herself and the New Jersey

Class.

118.   Plaintiff, the New Jersey Class members and Defendant are persons under

the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

119.   Hyundai engaged in "sales" of "merchandise" within the meaning of N.J.

Stat. § 56:8-1(c), (e). Hyundai's actions as set forth herein occurred in the conduct of

trade or commerce.

120.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful

"[t]he act, use or employment by any person of any unconscionable commercial practice,

deception, fraud, false pretense, false promise, misrepresentation, or the knowing

concealment, suppression, or omission of any material fact with the intent that others rely

upon such concealment, suppression or omission, in connection with the sale or

36

advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. § 56:8-2.

121.   In the course of Hyundai's business, Hyundai intentionally or negligently concealed and suppressed material facts concerning the Piston Defect affecting the Nu 1.8L engines. Defendants accomplished this by failing to disclose the known safety risk of engine failure from the piston defect, denying warranty claims arising from the defect, and denying the

122.   Defendants thus violated the provisions of the New Jersey CFA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

123.   Hyundai intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Jersey Class.

124.   Hyundai knew or should have known that its conduct violated the New Jersey CPA.

125.   Defendants owed Plaintiff and New Jersey Class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it:

      a.    Possessed exclusive knowledge of the piston defect;

      b.    Intentionally concealed the piston defect from consumers; and

      c.    Made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the New Jersey Class.

126.   Plaintiff and New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Hyundai's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the New Jersey Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of her vehicle, as well as lost or diminished use.

127.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

128.   As a result of the foregoing wrongful conduct of Defendant, Plaintiff and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just

and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

### COUNT V
### COMMON LAW FRAUD
**(On Behalf of the Nationwide Class and the New Jersey Subclass)**

129.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

130.    Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the Class Vehicles' engines, which was not readily discoverable until after the Vehicles were purchased. As a result, Plaintiff and the other Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said Piston Defect and all of the resultant problems.

131.    These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and Class members rely upon them.

132.    Plaintiff and Class members reasonably relied on these omissions, and suffered damages as a result.

### COUNT VI
### UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class and the New Jersey Subclass)**

133.    In the alternative, Plaintiff, individually and on behalf of the Class or, alternatively, the New Jersey Subclass, hereby incorporates the foregoing allegations as though fully set forth herein.

134.    Defendant knew or should have known that Plaintiff, the Class, and the Subclass paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

135.    Plaintiff, the Class, and the Subclass conferred substantial benefits on Defendant by purchasing the defective Class Vehicles. Defendant knowingly and willingly accepted and enjoyed those benefits.

136.    Defendants' retention of these benefits is inequitable.

137.    As a direct and proximate cause of Defendants' unjust enrichment, Plaintiff, the Class or, in the alternative, the Subclass, are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and members of the Classes, respectfully requests that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as the representative of the Class and their counsel as Class

counsel;

C.      award all actual, general, special, incidental, statutory, punitive, and

        consequential damages to which Plaintiff and Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief, including, without

        limitation, an order that requires Defendants to repair, recall, and/or replace

        the Class Vehicles and to extend the applicable warranties to a reasonable

        period of time, or, at a minimum, to provide Plaintiff and Class members

        with appropriate curative notice regarding the existence and cause of the

        design defect;

F.      award reasonable attorney's fees and costs; and

G.      grant such further relief that this Court deems appropriate.


DATED: June 29, 2018                         /s/ Matthew D. Schelkopf
                                             Matthew D. Schelkopf
                                             Joseph B. Kenney
                                             **Sauder Schelkopf LLC**
                                             555 Lancaster Avenue
                                             Berwyn, Pennsylvania 19312
                                             Telephone: (610) 200-0581
                                             mds@sstriallawyers.com
                                             jbk@sstriallawyers.com


                                             **MIGLIACCIO & RATHOD LLP**
                                             Nicholas Migliaccio*
                                             Jason Rathod*
                                             Esfand Y. Nafisi*

412 H Street Northeast, Suite 302
Washington, D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
enafisi@classlawdc.com

Daniel C. Levin, Esquire *
**LEVIN SEDRAN &
BERMAN**
510 Walnut Street
Suite 500
Philadelphia, PA 19102
Telephone: 215-592-1500
Facsimile: 215-592-4663

*pro hac vice* application forthcoming

Attorneys for Plaintiff and the
Putative Class